UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

MASONRY BUILDING OWNERS OF
OREGON, an Oregon mutual benefit
nonprofit corporation; FOUNTAIN
VILLAGE DEVELOPMENT LLC, an
Oregon limited liability company; and JIM A.
ATWOOD, in his capacity as trustee of the
Jim A. Atwood Trust dated August 10, 2017,

        Plaintiffs,

    v.

TED WHEELER, in his official capacity as
Mayor of the City of Portland and
Commissioner in charge of the Bureau of
Development Services; JO ANN
HARDESTY, in her official capacity as
Commissioner in charge of the Fire Bureau;
and CITY OF PORTLAND, an Oregon
municipal corporation,

        Defendants.

Case No. 3:18-cv-02194-AC

OPINION AND ORDER

1 - OPINION AND ORDER

ACOSTA, Magistrate Judge:

Plaintiffs Masonry Building Owners of Oregon ("MBOO"), Fountain Village Development LLC ("Fountain Village"), and Jim A. Atwood ("Atwood"), (collectively "Plaintiffs") bring this action against Defendants Mayor Ted Wheeler ("Mayor Wheeler"), Commissioner Jo Ann Hardesty ("Hardesty"), and the City of Portland ("the City") (collectively "Defendants"), seeking declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and 42 U.S.C. §§ 1983 and 1988. (Second Am. Compl., ECF No. 43.) Plaintiffs argue that the City's ordinance requiring all owners of unreinforced masonry buildings that do not meet specified seismic standards post a placard and provide notice to prospective tenants stating that the buildings may be unsafe in a major earthquake violates the First Amendment and the Due Process Clause of the Fourteenth Amendment.

The court has jurisdiction under 28 U.S.C. § 1331, and all parties consent to the jurisdiction of a U.S. Magistrate Judge under Federal Rule of Civil Procedure 73(b). The court conducted a preliminary injunction hearing on May 14, 15, and 21, 2019. For the reasons that follow, the court GRANTS Plaintiff's preliminary injunction.

*Background*

I.    History of the Ordinance

The City of Portland has determined that since 1995 when it required seismic upgrades to unreinforced masonry buildings under certain circumstances, less than 20 percent of Portland's URM building inventory has been retrofitted. (Hr'g Ex. 6 at 1.) In December 2014, the Portland City Council directed the Portland Bureau of Emergency Management, the Portland Development Commission, and the Portland Bureau of Development Services ("BDS") to work with community stakeholders to develop recommendations to reduce Portland's seismic risk from unreinforced

masonry buildings. (Hr'g Ex. 13 at 4; Hr'g Ex. 6 at 1.) An unreinforced masonry building or "URM" has been described as "a building with one or more walls that are made of adobe, clay, brick or blocks, with no steel reinforcement inside." (Hr'g Ex. 13 at 17.) URM buildings are "highly vulnerable to seismic damage" and are among the poorest performing buildings in any seismic event. (Hr'g Ex. 13 at 4; Tr. Prelim. Inj. Hearing May 14-15, 2019 ("Hr'g Tr.") at 334.) The recommendations were developed by three committees. The Support Committee developed financial incentives for performing seismic upgrades to URM buildings. (Hr'g Ex. 133 ¶ 5.) The Retrofit Standards Committee ("Standards Committee") comprised of experts in the fields of structural engineering, architecture, and geology, worked with BDS staff to identify best practices from other west coast jurisdictions. (Hr'g Ex. 6 at 1.) The Standards Committee recommended that Portland adopt a "mandatory seismic strengthening program that would require some level of upgrade for all URM structures with the exception of one and two family dwellings." (*Id.*) The Standards Committee met six times between December 2014 to May 2015. (*Id.* at 5.) The Standards Committee recognized that "it is neither practical nor financially feasible to retrofit all URM buildings to one standard, or within a single time frame" and created a "prioritization system based on factors such as the degree of risk posed by the building to its occupants and the public, the occupancy type and occupant load of the building, and the function of the building both before and after a seismic event." (*Id.* at 9.) Additionally, the Standards Committee recommended changes to the existing building code that would include building placards, tenant notifications, and real estate transaction disclosures. (*Id.* at 2.)

The URM Building Policy Committee ("the Policy Committee"), comprising members of the Incentive Committee and the Standards Committee, as well as advocates from historic

preservation, affordable housing, schools, churches, and URM building owners, met from December 2015 through November 2017, to synthesize the technical recommendations and data to create an overall policy report. The Policy Committee issued its final report in December 2017 (the "Final Report"). (Hr'g Ex. 13.) In the Final Report, the Policy Committee indicated that URM buildings pose a life-safety risk to building occupants in an earthquake. (*Id.* at 4, 6.) The Policy Committee indicated that URM buildings are seismically vulnerable because the roofs and floors can pull away from walls. (*Id.* at 6.) "With even light shaking, chimneys, parapets, and architectural ornaments may break off and fall." (*Id.*; *see also* Hr'g Ex. 6 at 5.)

The Final Report detailed that in 1995, the City adopted code changes requiring URM building owners to seismically upgrade their buildings under certain circumstances, such as substantial improvements and re-roofing, so-called "passive triggers." (*Id.* at 4, 7.) The Policy Committee reported that since the retrofitting code change in 1995, about eight percent of Portland URM buildings have been demolished, about five percent of the remaining URM buildings have been fully retrofitted, about nine percent have been partially retrofitted, and about 85 percent of existing URM buildings have had no retrofits at all. (*Id.* at 8.)

The Policy Committee recommended a limited, mandatory seismic strengthening program for Portland URM buildings based on the seismic risks Portland faces, the need to ensure public safety, and to address the lack of current codes. (*Id.* at 5.) The Policy Committee proposed a tiered approach that would require mandatory upgrades to critical buildings sooner and to a standard that "will enable their use after an earthquake, and lower-risk buildings later, to a cost-effective standard that will still reduce the danger they pose to the public." (*Id.*) The Policy Committee proposed that the City develop a program of property tax exemptions to help offset the costs of retrofitting,

4 - OPINION AND ORDER

increased funding for schools to retrofit, and an extended timeline for affordable housing retrofits. (*Id.*) For tax-exempt public assembly spaces, such as churches and synagogues, "which are ineligible for public subsidy and do not benefit from tax exemptions, the Policy Committee recommends a program of minimal upgrades plus warning placards." (*Id.*)

The Policy Committee further recommended that the City support a "public education campaign for building owners and tenants, a voluntary building placarding program to mark retrofitted URM buildings, and an earthquake navigator to assist building owners in navigating the permitting, financing, and design of seismic retrofits." (*Id.*)

The Policy Committee made its recommendations based on building class. Class 1 URM buildings are those structures that are "essential to emergency response," such as hospitals, police and fire stations, and water treatment plants. The Policy Committee recommended that Class 1 URM buildings meet the "highest proposed performance objective" because they are expected to remain operational after an earthquake event. (*Id.* at 18.) The Policy Committee identified six Class 1 buildings, five of which are owned by the City, and one by a private utility. (*Id.*)

Class 2 URM buildings are schools and high-occupancy buildings, such as schools, churches, and theaters. The Policy Committee recommended that Class 2 URM buildings be retrofitted to "provide greater resistance to collapse or major structural damage" due to their substantial life-safety risk, and with the expectation that such buildings likely would suffer some damage that could be repaired and made usable again with minor repairs immediately after an earthquake. (*Id.* at 18.) The Policy Committee estimated that there are 44 schools, 38 churches, and 10 other public assembly Class 2 URM buildings. (*Id.* at 19.)

5 - OPINION AND ORDER

Class 3URM buildings include most non-critical buildings with more than 10 occupants, such as private offices, apartments, restaurants, retail, and storage. The Policy Committee recognized that Class 3 buildings represent the largest group of URM buildings, numbering 1,332, but that they pose somewhat less risk "because they have no critical uses or large assembly areas." (*Id.*) The Policy Committee recommended that Class 3 URM buildings be retrofitted to a standard of "Collapse Risk Reduction." (*Id.*)

Class 4 URM buildings are low occupancy, with zero to ten occupants, and often are single story. (*Id.* at 4.) The Policy Committee recommended that Class 4 URM buildings be required to perform upgrades that protect nearby structures and people outside the buildings. (*Id.* at 20.) The Policy Committee estimated there are 201 Class 4 URM buildings. (*Id.*)

On June 13, 2018, the Portland City Council passed Resolution No. 37364 (the "Resolution"), which directed City staff to undertake a variety of measures to increase the safety of URM buildings. (Hr'g Ex. 16.) In the Resolution, the City acknowledged that it faces a significant risk from a "catastrophic earthquake" from the Cascadia Subduction Zone, and from smaller faults beneath the City. (*Id.*) The Resolution provided that URM buildings are highly vulnerable to earthquake damage, including collapse and loss of life. (*Id.*) The Resolution acknowledged that a series of volunteer committees met from December 2014 to November 2017 to review the inventory of URM buildings and a cost-benefit analysis of seismic retrofitting. (*Id.*) The Resolution provides that seismic retrofitting to achieve collapse prevention is desirable, but a majority of the Policy Committee supported mandatory seismic retrofitting to a "risk reduction standard" to increase public safety in a cost-effective way. (Hr'g Ex. 13 at 1; Hr'g Ex. 16.) The Resolution further recognized that URM building retrofitting will present a financial hardship for many owners. (Hr'g Ex. 16.)

The Resolution specifically recognized that URM buildings cannot be identified from the exterior and the proposed retrofitting standards will not prevent collapse; therefore, building occupants may "benefit from knowing when they enter or occupy a URM building." (*Id.* at 2.) Thus, the Resolution directed city staff to return to the City Council within three months with a proposed placarding ordinance to be enforced by Portland Fire & Rescue with an appeal process administered by BDS. (*Id.* at 3-4.)

II.    Ordinance 189201

On October 10, 2018, the City adopted Ordinance No. 189201 ("Ordinance 189201"). Ordinance 189201 applied to building owners the City designated as constructed of unreinforced masonry that were not retrofitted to a designated level to prevent collapse in the event of an earthquake. (Hr'g Ex. 107.) Ordinance 189201 defined "unreinforced masonry" as:

> adobe, burned clay, concrete or sand-lime brick, hollow clay or concrete block, hollow clay tile, rubble and cut stone and unburned clay masonry that does not satisfy the definition of reinforced masonry as defined herein. Plain unreinforced concrete shall not be considered unreinforced masonry for the purpose of this Chapter.

(Hr'g Ex. 107 at 5.) It also defined an "unreinforced masonry bearing wall" as "a URM wall that provides vertical support for a floor or roof for which the total superimposed vertical load exceeds 100 pounds per lineal foot of wall." (*Id.*) Ordinance 189201 defined an "unreinforced masonry bearing wall building" as "a building that contains at least one URM bearing wall." (*Id.*)

Ordinance 189201 contained three primary components. First, it required URM building owners to post in a conspicuous place a placard in boldface 50-point type stating the following: "This is an unreinforced masonry building. Unreinforced masonry buildings may be unsafe in the event of a major earthquake." (*Id.* at 7.) Failure to post the placard or undertake seismic upgrades

would subject the URM building owner to fines. Second, Ordinance 189201 required URM building owners to notify existing tenants and prospective tenants in writing that the building was constructed of unreinforced masonry. (*Id.* at 8.) Third, Ordinance 189201 required URM building owners to record their compliance with the Ordinance as an exception to their titles in the county's real property records. Some aspects of Ordinance 189201 were set to take effect March 1, 2019. (*Id.*)

Plaintiffs challenged Ordinance 189201 under the First and Fourteenth Amendments and moved for a preliminary injunction. (Mem. Supp. Pls.' Mot. Prelim. Injunction at 1-2, ECF No. 25.) Defendants' counsel stated in a February 12, 2019 email that a City commissioner had submitted a proposed amended ordinance which, if passed, could moot some of the issues Plaintiffs' injunction motion placed before the court. After a hearing on February 15, 2019, the court entered a 60-day temporary injunction. (Order Temporary Injunction, ECF No. 34.)

III.  Ordinance 189399

On February 29, 2019, the City of Portland adopted Ordinance No. 189399 ("Ordinance 189399" or "the Ordinance'), codified at Portland City Code ("P.C.C.") 24.85.065.[1] (Hr'g Ex. 108.) On March 22, 2019, Plaintiffs filed an Amended Motion for Preliminary Injunction. The Ordinance did not alter the definitions of "unreinforced masonry" or "unreinforced masonry bearing wall building."

---

[1] On May 1, 2019, the Portland City Council amended Ordinance No. 189399 by adopting Ordinance No. 189479. (Hr'g Ex. 105 at 9.) Ordinance No. 189479 clarifies language in Ordinance No. 189399 to the acknowledgment provision, and requires that the posted placards cite to the Portland City Code. (*Id.*) Because the amendments are relatively minor, the court does not further elaborate. The court and the parties' references to "the Ordinance" includes the most recent amendments.

The Ordinance, like its predecessor, contains three primary compliance provisions. First, the Ordinance requires URM building owners to place a placard at the entrance of their buildings stating the following:

> THIS IS AN UNREINFORCED MASONRY BUILDING. UNREINFORCED MASONRY BUILDINGS MAY BE UNSAFE IN THE EVENT OF A MAJOR EARTHQUAKE. P.C.C. 24.85.065.

P.C.C. 24.85.065(C); Hr'g Ex. 110 (attached as Appendix A to this Op. & Order). The placard must be posted in a conspicuous place on the exterior of the building near the main entrance, be no smaller than 8 by 10 inches, and the font must be at least 50-point bold type, legible sans serif. *Id.* The placard must remain in place until BDS confirms that the building has been retrofitted to a certain specification, or the building is demolished. *Id.* The estimated cost of a placard is between $30 to $60. Publicly owned URM buildings were required to post the placards by January 1, 2019; all other URM buildings are required to post the placard by November 1, 2020. P.C.C. 24.85.065(C)(6).

Second, the Ordinance requires URM building owners to provide a statement in every lease or rental application after June 1, 2019 that: "the building is an unreinforced masonry building, and unreinforced masonry buildings may be unsafe in the event of a major earthquake." P.C.C. 24.85.065(D).

Third, the Ordinance requires that URM building owners must not to remove the placard and acknowledge their compliance with the placarding requirement and the prospective tenant notification requirement by completing a form provided by BDS. P.C.C. 24.85.065(E). Documentation of compliance must be completed by June 1, 2020. *Id.*

Buildings that have been retrofitted to the collapse prevention standard for BSE-2 seismic hazards or life safety for BSE-1 seismic hazard as defined in the American Society of Civil

Engineers ("ASCE") 41-17 or ASCE 41-13 are exempt from the Ordinance. P.C.C. 24.85.065(F). Additionally, buildings that were retrofitted before January 1, 2018, to the Life Safety standard using FEMA 178, FEMA 310, or ASCE 31; or the Oregon Structural Specialty Code 1993 edition or later are exempt from the Ordinance. *Id.*

The Ordinance will be enforced through Portland Fire & Rescue's periodic inspections program. P.C.C. 24.85.065(G). Under that program, the Fire Marshal will inspect URM buildings for compliance. If the Fire Marshal determines there is a violation, the building owner has 40 days to comply and the Fire Marshal then will reinspect. *Id.* If the violation persists at the time of reinspection, the Fire Marshal will charge a reinspection fee and turn over enforcement to BDS. *Id.* The BDS compliance division then will send a violation letter detailing the fines and process for compliance. (Hr'g Tr. at 442.) The applicable fines vary based upon the use of the building and the number of units, up to $643 per unit per month. (*Id.*) At the hearing, Amit Kumar, the Engineering Supervisor for the Engineering Plan Review Section at BDS, testified at the hearing that fines will likely be imposed on a monthly basis, not a per-unit basis. (Hr'g Ex. 133.) However, Mr. Kumar acknowledged that the precise amount of fines for noncompliance with the Ordinance had not yet been determined. (Hr'g Tr. at 442-43.)

The Ordinance allows for building owners to appeal their designation as URM buildings and whether they have been retrofitted to the requisite standards. P.C.C. 24.85.065(H).

IV.    The Plaintiffs

MBOO is an Oregon mutual benefit nonprofit corporation that advocates for the interests of owners of masonry buildings, many of whom are subject to the Ordinance. (Mem. Supp. Pls.' Mot. Prelim. Inj. at 2, ECF No. 25.) Fountain Village owns Western Rooms, a mixed use multi-family

10 - OPINION AND ORDER

and commercial building that appears on the City's URM database, but has undergone significant seismic retrofitting. (Hr'g Ex. 73 at ¶¶ 1, 3-8.) Jim A. Atwood, in his capacity as trustee, is an owner of the Glade Hotel, a building that appears on the City's URM database and is subject to the Ordinance. (Hr'g Ex. 72 at ¶¶ 1, 3, 16.)

V.    The URM Database

BDS maintains a URM Building Database ("URM Database"). (Hr'g Exs. 131, 132.) The URM Database is a list of buildings located within the City of Portland believed to be constructed of unreinforced masonry. (*Id.*) The City conducted a URM building inventory over the course of three summers from 1994 to 1996, following adoption of the first URM building retrofit code requirements. (Hr'g Ex. 13 at 12; Hr'g Ex. 132 at ¶ 2.) The URM Database originally was compiled by City officials and engineering students at Portland State University ("PSU") who identified buildings visually as those most likely constructed of unreinforced masonry, as well as by examining building permit documents and Sanborn[2] maps. (Hr'g Ex. 132.) Michael Hagerty, a structural engineer for the City of Portland from 1975 to 2003, testified at the hearing that he trained and supervised the PSU students and performed random quality control checks of their work. (Hr'g Ex. 132.)

In 2014, the City updated the URM Database in conjunction with efforts to develop recommendations to reduce Portland's risk from URM buildings. (Hr'g Ex. 131.) The URM

---

[2] Sanborn Insurance Maps were originally created as a product to help insurance companies assess the potential fire risks in underwriting policies in urban areas. Portland Sandborn Maps, Portland Bureau of Planning, December 1, 2008, *available at* www. portlandoregon.gov/bps/article/ 146947 (last visited May 29, 2019). The detail included in the maps was extensive, including street plans, property lines, water and gas lines, and land uses. *Id.* The maps also included building information such as, building heights, footprints, the number of stories, and construction materials. *Id.* The first Portland maps were created in 1879, and the last were published in 1970. *Id.*

database was updated using tools such as Mapworks, Google maps, cross-referencing against permitted seismic upgrades, conducting building owner surveys, and performing site visits. (*Id.*) The City's URM building data also has been converted into an interactive map. The City warns, however, that "the accuracy of the database cannot be guaranteed due to a number of factors. . . . Some of the buildings may not be of URM construction. Some of the buildings may have been improved to better resist seismic loads." (*Id.*) In fact, the URM Database contains this disclaimer:

> The City of Portland makes no representations, expressed or implied as to the accuracy of this database. There are no assurances as to whether the information presented is correct or comprehensive.

> The presence of a building in this database is not a predictor of its performance in a seismic event. . . . The services of a licensed professional engineer are needed to determine the capacity of a building to resist seismic loads.

(Hr'g Ex. 39.) Shelly Duquette, a BDS structural engineer, testified that the City's practice is to keep a building in the URM Database unless it can be conclusively determined that it is not URM construction. (Hr'g Tr. at 346-48.) Additionally, Ms. Duquette explained that if a building has a bearing wall of URM, it will remain on the URM database and subject to the ordinance despite any other seismic upgrades. (Hr'g Tr. at 351.)

The City initially identified as URM construction approximately 2,100 buildings. (Hr'g Ex. 131 ¶ 13.) Of those, 250 buildings were removed after confirming they were not URMs, and 185 buildings were removed after confirming they were demolished. (*Id.*) The URM buildings include approximately 44 schools, 38 churches, and 248 multi-family structures, with more than 7,000 residential units. (Hr'g Ex. 13 at 10.) Of those residential units, 1,800 are publicly-financed affordable housing. (*Id.*) Currently, there are approximately 1,415 commercial URM buildings in the database. (*Id.*)

VI.    Retrofitting Expenses and Removal From URM Database

Plaintiffs contend the City's standards for removing a building from the URM Database are significantly more restrictive than the standards for determining whether a building must comply with the Ordinance in the first instance. *See* P.C.C. 24.85.065(G). Plaintiff Fountain Village completed a seismic upgrade of the Western Rooms building in 1979 to the 1977 seismic requirement. (Hr'g Ex. 73 at ¶¶ 1-5.) Although the seismic retrofitting was approved by the City and Portland Development Commission helped finance the project, the building remains subject to the placarding requirement. (*Id.* ¶¶ 5-6.)

Likewise, Walter McMonies, President of MBOO, is an owner of Trinity Place Apartments, LLC. (Hr'g Ex. 71 ¶ 1.) Mr. McMonies testified that Trinity Place Apartments have undergone two substantial seismic upgrades, including a three-year $1.2 million retrofitting project completed in 2017 and approved by BDS, the State Historic Preservation Office, and the National Park Service. (*Id.* ¶¶ 6-8.) Despite the significant retrofitting, Trinity Place Apartments also remains subject to the Ordinance. (*Id.* ¶¶ 10-11.)

Retrofitting many historic URM buildings to the standards required in the Ordinance likely exceeds their replacement value. (Hr'g Ex. 1.) For example, Mr. Atwood testified that the total cost to seismically upgrade the Glade Hotel would be approximately $1.8 million, about twice the replacement value of the building. (*Id.;* Hr'g Ex. 72; Hr'g Tr. at 95.)

The Policy Committee recommended "that the City should not move forward with a mandatory seismic retrofit program" until financial assistance and support is in place. (Hr'g Ex. 13 at 22.) The Policy Committee identified multiple potential sources of financial support for URM building owners, including a retrofit tax exemption, federal rehabilitation tax credits, seismic

rehabilitation grants, and a Seismic Commercial Property Assessed Clean Energy ("C-PACE") Program. (*Id.* at 22-23.)

The Policy Committee noted in its December 2017 Report that for a "typical" URM building, the benefits of retrofitting exceed the costs. (Hr'g Ex. 13 at 30.) Additionally, the Policy Committee noted that in general, "lower-cost retrofits to lower performance standards increase the benefit-cost ratio." (*Id.* at 31.) The Policy Committee indicated that for schools and public assembly URM buildings, the cost per square foot for retrofitting is $82.62 per square foot; the cost per square foot for most commercial URM buildings is $51.00 to $69.00 per square foot; and for small URM buildings and low occupancy buildings, the cost per square foot is around $20. The Policy Committee acknowledged that the benefit-cost ratio can vary significantly from building to building. (*Id.*) The Policy Committee also noted that Oregon's Legislature adopted Senate Bill 311 ("SB 311"), which permitted local jurisdictions to create a 15-year property tax exemption program for seismic retrofits. (Hr'g Ex. 13 at 22.) At the hearing, the court heard testimony that the City had not yet ratified SB 311 and, therefore, any property tax breaks remain unavailable. (Hr'g Tr. at 94.)

VII.    Exceptions to the Ordinance

The City initially delayed the implementation date of the Ordinance for thousands of URM buildings. BDS declared that Portland Public Schools would notify parents and staff in URM buildings by January 1, 2019, but BDS has not specified a deadline for placarding or where those placards must be placed, such as in auditoriums versus at main entrances. (Hr'g Ex. 23.) Ordinance 189201 contained different placarding implementation dates for non-profit URM building owners compared to private entities. Ordinance 189399 eliminates the distinction; all private and non-profit

URM building owners are required to post the placards by November 1, 2020. However, it is not clear whether any Portland Public School will be required to post placards by November 1, 2020.

Single-family and dual-family residences of URM construction are not required to comply with the Ordinance. (Papaefthimiou Dep. 75:3-23.) The Ordinance also does not require buildings constructed of non-ductile concrete and soft-story construction to comply with the Ordinance, despite posing seismic risks similar to URM construction in major earthquakes. (Hr'g Ex. 6 at 6; Hr'g Ex. 11.) The Standards Committee identified non-ductile concrete buildings in addition to URMs as "'generally the most dangerous types of buildings in an earthquake, and should not be allowed to remain in service indefinitely unless they are fully upgraded.'" (Hr'g Ex. 6 at 6 (quoting the Oregon Seismic Safety Policy Advisory Commission ("OSSPAC") report *The Oregon Resilience Plan*). The Policy Committee making URM recommendations to City Council included "other risky buildings" in its July 2017 draft report:

> The committee recognizes that while URM buldings are dangerous in earthquakes, they are not the only buildings to pose a significant life safety risk. Soft-story buildings that lack a shear wall on the first floor are vulnerable to collapse for that reason. Non-ductile concrete buildings are made of brittle unreinforced concrete and may have many of the same risks as URM buildings. There are far fewer of these building types in Portland. However, in future years, the Committee recommends that the City conduct a complete inventory of both soft-story and non-ductile concrete buildings and consider enacting similar retrofit requirements for these buildings.

(Hr'g Ex. 10 at 32.) However, one member of the Policy Committee recommended against including this section at all in the URM Building Policy Committee Final Report because it "distracts from the URM-specific message and could become a 'lightning rod' to be used by those opposing the mandate as a reason to do nothing for URM buildings." (Hr'g Ex. 11.) City staff removed the section on "other risky buildings" from the December 2017 final report. (Hr'g Ex. 13.)

Under the initial version of the Ordinance, URM buildings owned by non-profits (including faith organizations) were given longer to comply than other URM building owners. At an October 3, 2018 City Council Meeting, Commissioner Saltzman explained that religious and non-profit organizations should be given more time to comply with the Ordinance to permit those organizations more "time to discuss the issue and to better understand the danger imposed by unreinforced masonry buildings." (Hr'g Ex. 19.) Jonna B. Papaefthimiou, Planning, Policy, and Community Program Manager for the Portland Bureau of Emergency Management ("PBEM"), also agreed that exemptions for churches and non-profits were provided because they have financial constraints that other building owners do not have, and that it was a matter of "cultural sensitivity." (Decl. Chris Swift Ex. 4, Dep. Joanna Papaefthimiou ("Papaefthimiou Dep.") at 77:6-78:21, ECF No. 26-4.)

VIII.    The Purpose of the Ordinance

At an October 3, 2018 Portland City Council Hearing, Mayor Wheeler discussed the passage of Resolution No. 37364 and adoption of Ordinance 189201. (Hr'g Ex. 19.) Commissioner Saltzman explained that: "Giving Portlanders the placards I believe helps build awareness of seismic risk, about what to do if you're in an unreinforced masonry building, to duck, cover, not to get out, and it also builds market demand for seismic improvements to these buildings." (Id.) In his deposition, Mr. Saltzman stated that it was fair to say that nothing in the placard and tenant notifications that advises the public to duck, cover, and hold on in event of an earthquake. (Decl. John DiLorenzo Supp. Am. Mot. Prelim. Inj. Ex. 1, Dep. Dan Saltzman ("Saltzman Dep." at 38:3-39:16, ECF No. 77-1.) At the hearing, Commissioner Saltzman acknowledged that he preferred that the City adopt mandatory retrofits for URM buildings instead of posting placards, but that the Council as a whole did not support mandatory retrofits. (Hr'g Ex. 21.)

The City highlights that California has required local jurisdictions to identify all potentially dangerous buildings since the 1980s, and has required URM building owners to post placards.[3] (Hr'g Ex. 6 at 5; Cal. Gov't Code § 8875.8(a),(b).) Anecdotal evidence suggests placarding helps inform the public, but there is no evidence nor are there studies to show that businesses have lost revenue or tenants have not entered into lease agreements because of the law. (Hr'g Ex. 6 at 5.) The City highlights that as of 2017, 98 percent of URM buildings in the City of Berkeley have been reinforced, and only six URM buildings remained. (Hr'g Ex. 114.) At the hearing, Ms. Papaefthimiou acknowledged that URM building retrofits were mandatory in the City of Berkeley. (Hr'g Tr. at 216-17.) The Ordinance at issue here does not require mandatory retrofitting.

During her deposition on January 30, 2019, Ms. Papaefthimiou explained that the ordinance's tenant notification provision informs tenants they are living in a URM building. (Papaefthimiou Dep. at 50:11-23.) Ms. Papaefthimiou explained the Ordinance requires placarding to "let people know they are in a building that has significant risk in an earthquake and have people think about what to do, drop, cover and hold on," (*id.* at 52:16-24), but she acknowledged that the placards do not actually state that message. (*Id.* at 53:5-10.) Ms. Papaethimiou noted that the City is developing an "informational poster that [tells] people what to do in an earthquake to say drop, cover, and hold on." (*Id.* at 53:17-24.) She indicated that the message currently required in the placard is based on similar placards required in the State of California. (*Id.* at 53:11-18.) Indeed, Ms. Papaethimiou believes the informational poster "will be more effective than the placard." (*Id.* at 54:10-11.)

---

[3] The California statute provides for initial administrative fines of $250 for failing to post the placard, with additional fines of up to $1,000. Cal. Gov't Code § 8875.8.

On February 1, 2019, Commissioner Jo Ann Hardesty, who oversees Portland Fire & Rescue, announced that she was pausing enforcement of Ordinance 189201, stating that "A placard is a band-aid for a much larger problem. Until we have better support in place, especially in the form of funding assistance for these projects, I want placarding enforcement on hold for businesses and non-profit organizations." (Swift Decl. Ex. 12, ECF No. 26-12.)

On February 19, 2019, now former Commissioner Dan Saltzman penned an opinion piece to *The Oregonian* in which he urged current City Commissioners to continue to support the Ordinance. (Decl. John DiLorenzo Opp'n Defs.' Mot. Protective Order Ex. 1 at 2-4, ECF No. 71-1.) In the piece, Commissioner Saltzman contends the City has an obligation to provide Portlanders with information about the risk of collapse. (*Id.*) Additionally, Commissioner Saltzman appeared to acknowledge that the cost of retrofitting is so high it may force some building owners to demolish, sell, or redevelop. (*Id.*) Commissioner Saltzman suggested that demolition is more desirable for buildings whose owners are unable to afford the retrofitting – "better that it happen intentionally and unoccupied than in an earthquake." (*Id.* at 3.)

IX.    The Lawsuit

Plaintiffs seek declaratory and injunctive relief, contending that the Ordinance seeks to compel speech that is not narrowly tailored to address a compelling government interest. Plaintiffs argue that the Ordinance violates the First Amendment on its face and cannot survive strict scrutiny, or even a lower standard of scrutiny. Alternatively, Plaintiffs argue that the Ordinance is so vague and overbroad it violates the Due Process Clause of the Fourteenth Amendment. According to Plaintiffs, because they are likely to succeed on the merits, a preliminary injunction should issue.

Defendants argue that the Ordinance is government speech and is rationally related to a legitimate governmental interest. Alternatively, Defendants contend that the Ordinance's tenant notification provision is a permissible health and safety warning because it is purely factual, noncontroversial and not unduly burdensome. Defendants also argue that Plaintiffs cannot demonstrate a Due Process violation. Thus, Defendants contend Plaintiffs are not likely to succeed on the merits and fail to demonstrate irreparable harm; thus, a preliminary injunction is unnecessary.

In evaluating the Ordinance, the court must determine whether the Ordinance implicates the First Amendment and, if so, what level of scrutiny applies to the Ordinance, and whether Plaintiffs have demonstrated that a preliminary injunction is appropriate.

*Legal Standards*

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). A plaintiff seeking a preliminary injunction must establish: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). In the Ninth Circuit, a preliminary injunction also may be appropriate if a plaintiff demonstrates "serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor," as long as the second and third *Winter* factors are satisfied. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017); *Alliance for the Wild Rockies*, 632 F.3d at 1131-35 ("'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test"); *accord Alliance*

*for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (discussing sliding scale standard).

The Ninth Circuit has recognized that application of preliminary injunction standards in the face of a First Amendment challenge involves "'an inherent tension: the moving party bears the burden of showing likely success on the merits – a high burden if the injunction changes the status quo before trial – and yet within that merits determination the government bears the burden of justifying its speech-restrictive law.'" *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011)). Therefore, "'in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction.'" *Id.* (quoting *Thalheimer*, 645 F.3d at 1116).

## Discussion

I.    The Ordinance Is Not Government Speech

According to the City, the Ordinance is akin to all public safety signs, such as "emergency exit," "no smoking," and signs requiring employees to wash their hands. Thus, the City argues, the Ordinance's provisions are "government speech," and pose no First Amendment issues. The City relies on *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015), and *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009), for its contention.

The premise of the "government speech" doctrine is that the government's own speech is exempt from First Amendment scrutiny. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 553 (2005). According to Defendants, there are three factors the court must consider when determining

whether certain expression constitutes government speech: (1) the government's history of using the particular mode of expression to communicate with the public; (2) whether that mode of expression is closely identified by the public with the state; and (3) the extent to which the state has regulated the content of messages in the mode of expression and has exercised final approval authority over the messages. *Walker*, 135 S. Ct. 2248-49; *Summum*, 555 U.S. at 472-73.

Defendants' reliance on *Walker* and *Summum* is misplaced. *Walker* and *Summum* involved private speech on government property. In *Walker*, the private speaker's expression was a confederate flag on a government-issued license plate. *Walker*, 135 S. Ct. at 2248. In *Summum*, the private speaker wanted to place a privately-donated permanent monument in a government-owned public park. *Summum*, 555 U.S. at 472-73.

Unlike either *Walker* or *Summum*, Plaintiffs here do not seek to impose their speech on the City. Instead, the issue here is whether the City can compel private citizens to convey the City's message on private property. Contrary to Defendant's contention, both *Walker* and *Summum* recognized that "the Free Speech Clause itself may constrain the government's speech, if, for example, the government seeks to compel private persons to convey the government's speech." *Walker*, 135 S. Ct. at 2246; *see also Summum*, 555 U.S. at 467.

As Plaintiffs correctly indicate, avoiding First Amendment scrutiny requires showing: (1) the government itself is the speaker; and (2) the government appropriates public funds to transmit its message through private speakers. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 540-42 (2001) (discussing that viewpoint based funding decisions can be sustained in some instances where the government is the speaker); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995) ("[W]hen the government appropriates public funds to promote a particular policy of

its own it is entitled to say what it wishes."). Although the Ordinance is a government-mandated script for placard and lease applications, the government itself is not the speaker. Instead, Defendants are requiring Plaintiffs to carry their message, a message not occurring on public property. Additionally, the Ordinance does not provide for public funds to private entities to convey the government's message. *See Rosenberger*, 515 U.S. at 833 ("When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee."); *PSEG Long Island LLC v. Town of North Hempstead*, 158 F. Supp. 3d 149, 166 (E.D.N.Y. 2016) (holding government speech did not apply to ordinance requiring placard with warning about chemically treated wood be posted on privately owned utility poles). Accordingly, the court rejects Defendants' argument that the Ordinance is somehow protected from First Amendment scrutiny as government speech.

## II.    First Amendment Principles

The First Amendment, applied to the states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." U.S. CONST. amend. I. The First Amendment includes "the right to speak freely, and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *Board of Education v. Barnette*, 319 U.S. 624, 633-34 (1943)). "Its protection is broad, and the Supreme Court has 'been reluctant to mark off new categories of speech for diminished constitutional protection.'" *Am. Beverage Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 755 (9th Cir. 2019) (quoting *Nat'l Inst. of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2372 (2018)).

Generally speaking, laws that target speech based on its content "'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *NIFLA,* 138 S. Ct. at 2371 (quoting *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2226 (2015)). "Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny." *Turner Broadcasting System, Inc. v. F.C.C.,* 512 U.S. 622, 642 (1994). As recognized in *NIFLA,* "compelling individuals to speak a particular message" is a content based regulation because it "'alters the content of their speech.'" *NIFLA,* 138 S. Ct. at 2371 (quoting *Riley v. Nat'l Fed'n of Blind of N.C., Inc.,* 487 U.S. 781, 795 (1988) (alterations omitted)). Thus, a regulation that compels a disclosure is a content-based regulation of speech, subject to heightened scrutiny, unless an exception applies. *NIFLA,* 138 S. Ct. at 2371; *Am. Beverage,* 916 F.3d at *4, *6.

The Supreme Court has recognized that the First Amendment "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 563 (1980); *NIFLA,* 138 S. Ct. at 2372. And, the Supreme Court and the Ninth Circuit have determined that a lower level of scrutiny may apply in certain contexts to laws compelling disclosure of factual, noncontroversial information in commercial speech. *NIFLA,* 138 S. Ct. at 2372; *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 651 (1985); *Am. Beverage,* 916 F.3d at 755.

To succeed on a typical facial attack on First Amendment grounds, the party challenging the government's action needs "to establish that no set of circumstances exists under which [the statute] would be valid, or that the statute lacks any plainly legitimate sweep." *United States v. Stevens,* 559 U.S. 460, 472 (2010) (internal quotation marks and citations omitted).

III.    Likelihood of Success on First Amendment Claims

A.    *Content-Based*

Here, there can be no debate that the Ordinance is content-based because it regulates only URM building owners' speech. By requiring URM building owners to speak a particular government-drafted message through placards, lease application disclosures, and acknowledgments, the Ordinance "alters the content of their speech." *NIFLA*, 138 S. Ct. 2371; *see also Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 957 (9th Cir. 2012) (holding regulation that applied only to yellow pages directories was a content based restriction); *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (holding that "[a] regulation is content-based if either the underlying purpose of the regulation is to suppress particular ideas or if the regulation, by its very terms, singles out particular content for differential treatment."). Because the Ordinance seeks to regulate only URM building owners' speech, the Ordinance is subject to strict scrutiny unless it falls within an exception.

B.    *Commercial Speech*

The Ninth Circuit recently confirmed that the *Zauderer* analysis governs First Amendment challenges to compelled commercial speech – even when the "government requires health and safety warnings, rather than warnings to prevent the deception of consumers." *Am. Beverage*, 916 F.3d at 756. In *American Beverage*, beverage retailers challenged a city and county ordinance that required them to place a warning on some advertisements for their beverages containing the following message: "WARNING: Drinking beverages with added sugar(s) contributes to obesity, diabetes and tooth decay. This is a message from the City and County of San Francisco." *Am. Beverage*, 916 F.3d at 753. There, the parties did not dispute that the required sugary beverage warnings involved commercial speech because the ordinance specifically applied to advertisements on billboards,

stadiums, transit shelters, vehicles, or walls and surfaces. *Id.* Thus, the *American Beverage* decision did not address whether the compelled speech there involved "commercial speech" in the wake of *NIFLA*.

The *American Beverage* court determined that "*Zauderer* provides the proper analytical framework for considering required warnings on commercial products: '[T]he government may compel truthful disclosure in commercial speech as long as the compelled disclosure is 'reasonably related' to a substantial governmental interest." *Id.* at 755 (quoting *CTIA – The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1115 (9th Cir. 2017), *vacated by* 138 S. Ct. 2708 (2018)); *NIFLA*, 138 S. Ct. at 2377. Under *Zauderer*, the court examines whether the compelled speech is: "(1) purely factual, (2) noncontroversial, and (3) not unjustified or unduly burdensome." *Am. Beverage*, 916 F.3d at 757. "A compelled disclosure accompanying a related product or service must meet all three criteria to be constitutional." *Id.* (citing *NIFLA*, 138 S. Ct. at 2372).

Here, Plaintiffs argue that none of the Ordinance's provisions are commercial speech, and therefore, the lower *Zauderer* level of scrutiny does not apply. Alternatively, Plaintiffs assert that if the lease application provision could be viewed as commercial speech, that provision fails to satisfy any of the three *Zauderer* prongs. Defendants respond that health and safety disclosures in the lease applications readily satisfy *Zauderer* because the required disclosure is purely factual, noncontroversial, and is not unjustified or unduly burdensome.[4] The court begins its analysis by addressing whether any provision of the Ordinance is commercial speech, and thus subject to a lower level of scrutiny.

---

[4] Defendants concede that the placards do not involve commercial speech.

1.     the placard provision is not commercial speech

The Supreme Court has indicated that "the core notion of commercial speech" is that "it does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013); *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011). Commercial speech also has been defined as "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson*, 447 U.S. at 561. Whether any particular expression is "commercial speech" is a fact-driven analysis due to the difficulty of drawing bright lines. *First Resort, Inc. v. Herrera*, 860 F.3d 1263,1272 (9th Cir. 2017). "Where the facts present a close question," courts typically find commercial speech if the *Bolger* factors are present: (1) the speech is an advertisement, (2) the speech refers to a particular product, and (3) the speaker has an economic motivation. *Hunt*, 638 F.3d at 715 (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983)). Whether speech is commercial or noncommerical should rest on "'the commonsense' distinction between speech proposing a commercial transaction . . . and other varieties of speech." *Bolger*, 463 U.S. at 64; *Dex Media*, 696 F.3d at 958-59 (finding Yellow Pages not commercial speech because it did not refer to a specific product and the paid advertisements inside the directory comprised less than half the content); *Hunt*, 638 F.3d at 716 (upholding restriction on number of boardwalk vendors as time, place, and manner restriction on commercial speech because the core of vendors' activity was directed to their products and why consumers should by them).

Turning to the placard provision of the Ordinance, the court readily finds that the placards are not commercial speech. While placards are to be posted in conspicuous places near the front of the buildings, they are not in an advertising format. They bear none of the indicia typically

associated with advertising, either in design or content. And, unlike advertisements, the placards display citation to a municipal ordinance. This is the very "commonsense distinction" the Supreme Court has encouraged lower courts to make.

Moreover, the placards do not propose any kind of commercial transaction, and do not convey any discernable relationship to any products or services offered by Plaintiffs. Indeed, Plaintiffs have no economic motivation to display the placards because they compel Plaintiffs to state a message they wish to avoid. The court finds that the placards fall outside any commonsense understanding of commercial speech. *See PSEG*, 158 F. Supp. 3d at 164-65 (holding ordinance that compelled placards to be posted on privately owned utility poles warning of hazardous chemical treatment was not commercial speech). Thus, the court examines the placard provision under strict scrutiny in section C *infra*.

2.    the tenant notification provision is commercial speech

Whether the tenant notification provision is commercial speech poses a more difficult question. The tenant notification provision requires that for "[e]very application for lease or rental supplied to a prospective tenant after June 1, 2019, involving a [URM] building . . . must contain a statement that: the building is an unreinforced masonry building and unreinforced masonry buildings may be unsafe in the event of a major earthquake." P.C.C. 24.85.065(D). According to Plaintiffs, a lease application is not an advertisement because lease applications are not circulated to the public, but rather are the among the final steps before a transaction is consummated. (Pls.' Mem. Supp. Am. Mot. Prelim. Inj. at 22.) Plaintiffs argue that lease applications do not reference a specific product because landlords often use standardized forms across multiple properties. Plaintiffs also argue that landlords utilize lease applications to garner information from prospective

tenants, not for tenants to learn about the landlords' properties. (Hr'g Ex. 5 at ¶ 4.) Plaintiffs appear

to acknowledge that landlords have an economic motivation in providing lease applications but

contend that lease applications are not advertisements that refer to particular products, and thus the

remaining *Bolger* factors for commercial speech are absent.

Defendants contend that the tenant notification provision of the Ordinance is compelled

commercial speech, and should be analyzed as a health and safety warning under *Zauderer*.

Defendants argue that health and safety regulations need not be part of a commercial advertisement

or part of a commercial transaction for *Zauderer* to apply.

The court finds that the tenant notification provision is commercial speech. Considering the

*Bolger* factors, the court finds that URM building owners have an economic interest in entering into

leases with prospective tenants. Plaintiffs' contention that lease applications do not identify a

specific product is not persuasive. Some URM building owners may own several buildings and use

the same lease application across multiple buildings; as Mr. Beardsley testified, he obtains his lease

applications from a local management company. (Tr. at 109.) It appears more likely, however, that

a URM building owner will have one property with a single lease, or that the specific lease entered

into by the prospective tenant will have been tailored to a particular building. *See* Hr'g Ex. 5

(attaching standard lease application); *Bolger*, 463 U.S. at 66-67 (examining combination of factors

to determine that informational pamphlets were commercial speech, applying *Central Hudson*); *see*

*also San Francisco Apartment Ass'n v. City and County of San Francisco*, 881 F.3d 1169, 1176-77

(9th Cir. 2018) (finding that ordinance requiring landlords prior to beginning buyout negotiations

for condominium conversions to provide notice to tenants that included contact information for

tenants' rights organizations was commercial speech, applying *Central Hudson*). Therefore, broadly

considering the *Bolger* factors, the court finds that the tenant notification provision of the Ordinance is commercial speech.

The court now examines whether *Central Hudson* or *Zauderer* applies. In *American Beverage*, the parties did not dispute that the sugary beverage warning targeted commercial speech and compelled certain disclosures. *Am. Beverage*, 916 F.3d at 755. Instead, the parties there disputed whether the ordinance should be examined under the *Central Hudson* test for commercial speech, or whether a more relaxed standard for health and safety warnings under *Zauderer* applied. *Id.* at 755-56. The *American Beverage* court concluded that *NIFLA* required it to "reexamine how we approach a First Amendment claim concerning compelled speech." *Id.* at 756. The Ninth Circuit concluded that "*NIFLA* preserved the exception to heightened scrutiny for health and safety warnings" and that *Zauderer* provides the proper framework. *Am. Beverage*, 916 F.3d at 755. This court is not wholly convinced that the *Zauderer* exception to heightened scrutiny for commercial speech provides the correct test. *See San Francisco Apartment Ass'n*, 881 F.3d at 1177-78 (applying *Central Hudson* to tenant buyout disclosure provision). But much like the Supreme Court in *NIFLA* with respect to the unlicensed notices, the court recognizes that if the tenant notification provision of the Ordinance cannot withstand First Amendment scrutiny under *Zauderer*, it cannot survive heightened scrutiny. *See NIFLA*, 138 S. Ct. at 2376-77; *see Am. Beverage*, 916 F.3d at 759 (Ikuta, Circuit Judge, concurring) (noting that *NIFLA* did not determine whether strict scrutiny or intermediate scrutiny applies to government-compelled commercial disclosures that do not fall under *Zauderer*).

////

////

3.     *Zauderer* application to the tenant notification provision

Defendants must show that the tenant notification provision is purely factual, noncontroversial, and is not unjustified or unduly burdensome. *Am. Beverage*, 916 F.3d at 756. Additionally, the disclosure must be reasonably related to a substantial governmental interest. *Id.* at 755. The court concludes that on this preliminary record, Defendants have failed to demonstrate that the tenant notification provision in the Ordinance satisfies *Zauderer*.

a.     *purely factual*

Defendants contend that the tenant notification provision of the Ordinance is purely factual because it requires that URM building owners disclose to prospective tenants that the building is constructed of unreinforced masonry, and that it may be unsafe in the event of a major earthquake. Defendants contend that "whether a particular building qualifies as a URM building is beside the point" because the URM database has been updated, and there is a mechanism to remove a building from the URM list if it is erroneously included or if the building has been retrofitted to the seismic-code standards in Code 24.85.065(F). (Defs.' Resp. Am. Mot. at 21, ECF No. 61.) Defendants contend that the tenant notification provision is purely factual despite identifying buildings that have undertaken some seismic upgrades, but have not yet completed enough retrofitting to be exempt as "unreinforced masonry buildings" because they are so defined in the Ordinance.

The compelled disclosures are not purely factual. Some URM buildings have undergone significant seismic upgrades, but are not exempt under the Ordinance. The Ordinance provides an exemption for buildings that are fully retrofitted to the collapse-prevention standards set out in the Ordinance, or were retrofitted to a Life-Safety performance level prior to January 1, 2018, or to the Oregon Structural Specialty Code 1993 standards. P.C.C. 24.85.065(F). But, the tenant notification

provisions do not distinguish between URM buildings that have undergone some significant retrofitting even if less than the level required for exemption under the Ordinance, and those URM buildings that remain completely unreinforced. In so doing, the Ordinance requires some URM building owners to notify tenants that their buildings are unreinforced when, in fact, that is not the case.

For example, Plaintiff Fountain Village underwent significant seismic upgrading in 1979, with approval from the City and financial assistance from Portland Development Commission. (Hr'g Ex. 73 at ¶¶ 5-7.) Under the Ordinance, however, it does not qualify for an exemption. Nevertheless, Fountain Village is required to falsely inform prospective tenants that it is an "unreinforced masonry building." (*Id.* ¶¶ 1-5.) As John Beardsley testified, the Ordinance will make him "a liar." (Hr'g Tr. at 109.)

Likewise, the President of MBOO, Walter McMonies, will be required to inform prospective tenants for Trinity Place Apartments that the building is unreinforced masonry despite that it has undergone significant seismic retrofitting from 2014 to 2017. (Hr'g Ex. 71 at ¶¶ 1-3.) Trinity Place's seismic upgrade was undertaken to survive a "major earthquake," but less than a 9.0 magnitude, was approved by BDS, and cost approximately $1.1 million. (*Id.* ¶¶ 6-8.) Thus, the Ordinance falsely requires McMonies to inform prospective tenants that Trinity Place Apartments is an unreinforced masonry building *and* is unsafe in the event of a major earthquake.[5]

Additionally, whether buildings are constructed of URM and subject to the Ordinance's tenant notification provisions is premised on a faulty URM database. The court heard testimony

---

[5] The Ordinance does not define "major earthquake" or provide criteria for determining when and how this standard is met.

from Michael Hagerty, a structural engineer and the Engineering Plan Review Supervisor for the City of Portland from 1979 to 2003. (Hr'g Tr. at 252.) Mr. Hagerty testified that he oversaw the process by which the City compiled its initial URM inventory in conjunction with Portland State University engineering students. (*Id.* at 254-55.) His testimony revealed that the methods used to gather information for the database were neither scientific nor reliable.

Mr. Hagerty testified that student lead teams identified URM buildings visually and that the students were not encouraged to enter private buildings to assess them. (*Id.* at 280-81.) The students identified over 2,100 buildings as being constructed of URM, but there were errors. Indeed, approximately 250 buildings have been removed after "conclusive evidence" showed they were in fact not URM buildings. (Hr'g Ex. 133 ¶ 15.) Students were sent out in groups of three but it was unclear whether all three examined each building or whether they covered their assigned area individually. (Hr'g Tr. at 281-83.) If the students conferred, they kept no notes or documentation which explained how they concluded a building was of URM construction. (Hr'g Tr. at 282-83.) Also, the PSU students kept no records of the buildings they examined unless they determined the building was of URM construction. (Hr'g Tr. at 284-85.)

Another structural engineer with the City, Shelly Duquette, testified that absent "conclusive evidence" that a building is not constructed of unreinforced masonry, the building will remain in the City's URM database, and consequently, subject to the Ordinance. (Hr'g Ex. 131 ¶ 10.) Ms. Duquette suggested that building owners could hire licensed engineers to investigate whether their buildings are URM. (Hr'g Tr. at 346.) Adam Jongeward, a structural engineer working for DCI Engineers, testified that it is often very difficult to determine whether a building is URM from the outside, and that it is difficult to remove a building from the URM database. (Hr'g Tr. at 521-22.)

Finally, the City's own website disclaims the accuracy of URM database: "The City of Portland makes no representations, express or implied, as to the accuracy of this database." (Hr'g Ex. 39.) In short, the URM database is flawed, and erroneously puts the burden on building owners to disprove its accuracy.

Therefore, the court concludes that the Ordinance does not compel purely factual information because it falsely identifies some buildings as unreinforced and erroneously identifies some buildings as constructed of URM, even in situations where such a statement is patently untrue. "*Zauderer* and subsequent case law leave no doubt that any government-compelled speech must be, at the very least, factually accurate." *Am. Beverage*, 916 F.3d at 764 (Christen, J., and Thomas, C.J., concurring) (concluding that sugary beverage disclosure was not factually accurate because not every consumer will acquire diabetes, suffer tooth decay, or become obese). The court finds the tenant notification provision fails to satisfy the *Zauderer* exception for that reason alone.

### b. noncontroversial

Defendants contend that the disclosure requirement is noncontroversial because "it is not subject to reasonable debate" that URM buildings are not safe in the event of a major earthquake. (Defs.' Resp. Am. Mot. Prelim. Injunction at 21.) According to Defendants, that URM buildings are uniquely dangerous in earthquakes is purely factual information, and thus the Ordinance is noncontroversial.

Courts have described "uncontroversial" as referring to the "factual accuracy of the compelled disclosure." *Nat'l Ass'n of Wheat Growers v. Zeise*, 309 F. Supp. 3d 842, 851 (E.D. Cal. 2018) (citing *CTIA*, 854 F.3d at 1117, and applying *Zauderer* to California warning requirement for herbicide). In *National Wheat Growers*, the court discussed that a compelled disclosure may be

literally true, but nevertheless misleading, and in that sense untrue; and thus unconstitutional compelled speech under *Zauderer. Id.* The court concludes that the compelled disclosure here is misleading. Even if it is factually true that a subject building that has undertaken some retrofitting but below the level required for exemption under the Ordinance, the building owner is required to notify tenants that it is unreinforced masonry. While structural engineers may understand that "unreinforced masonry" has a particular meaning under the Ordinance, the average prospective tenant likely will not. "Ordinary consumers do not interpret warnings in accordance with a complex web of statutes, regulations, and court decisions[.]" *Wheat Growers*, 309 F. Supp. 3d at 851 (striking down warning that herbicide "known to cause cancer" as controversial because a reasonable consumer would not understand difference between a substance that causes cancer, and those "probably carcinogenic" under regulations); *accord Am. Beverage*, 916 F.3d at 766 (Christen, J. and Thomas, C.J., concurring) ("Because the message would be conveyed to sophisticated and unsophisticated consumers, we must read it literally."). Thus, the court finds the tenant notification in the Ordinance misleading because it does not distinguish between a building that has undertaken some retrofitting yet remains technically "unreinforced" and a building that has completed no retrofitting whatsoever.

Moreover, it is misleading to require all URM buildings to state that they may be unsafe in a major earthquake. As the Standards Committee observed, in the 6.5 magnitude Paso Robles earthquake in 2003, none of the nine retrofitted URM buildings there experienced major damage, whereas the URM buildings without any retrofitting experienced extensive damage. (Hr'g Ex. 6 at 8.) As discussed above, by requiring all URM building owners to disclose in the lease applications

that their buildings may be unsafe, when in fact the buildings may have undergone extensive seismic retrofitting and may perform well in an earthquake, the compelled disclosure is misleading.

Further, the court finds that the compelled disclosure is controversial because it singles out URM buildings despite evidence that other buildings are at significant risk in the event of a major earthquake. Defendants exempted from the Ordinance all buildings constructed of non-ductile concrete, all buildings of soft-story construction, and all construction in liquifaction zones. (Hr'g Ex. 10 at 32.) The Standards Committee found that "'[u]nreinforced [m]asonry (URM) and non-ductile concrete buildings are generally the most dangerous types of buildings in an earthquake, and should not be allowed to remain in service indefinitely unless they are fully upgraded.'" (Hr'g Ex. 6 at 6 (quoting OSSPAC's *The Oregon Resilience Plan*).) The Standards Committee made no distinction between the two forms of construction for this purpose. At the hearing, Mr. Kumar testified that soft-story construction, non-ductile concrete, and all buildings in liquefaction zones will perform poorly in a major earthquake, such as a 9.0 magnitude Cascadian Subduction Zone earthquake. (Tr. at 22, May 15, 2019 pm.) Thus, to the extent that Defendants have singled out URM buildings for compelled disclosures, the Ordinance is misleading, controversial, and inflammatory. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 966-67 (9th Cir. 2009) (holding that labeling requirement for videogame retailers was not purely factual or uncontroversial because the "18" sticker did not convey factual information), *aff'd sub nom Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011). Accordingly, the tenant notification provision of the Ordinance is not purely factual and noncontroversial under *Zauderer*.

////

////

35 - OPINION AND ORDER

c.     *justified and not unduly burdensome*

In *American Beverage*, the Ninth Circuit determined that to be justified, the defendants must demonstrate that the compelled disclosure is reasonably related to a substantial government interest. *Am. Beverage*, 916 F.3d at 755. And, *American Beverage* suggested that protecting the health and safety of consumers promotes a substantial government interest. *Id.* at 756. The Supreme Court described that for compelled disclosures to not be unduly burdensome under *Zauderer,* the disclosures must "remedy a harm that is 'potentially real not purely hypothetical,'" and that the disclosures not extend broader than reasonably necessary. *NIFLA*, 138 S. Ct. at 2377 (quoting *Ibanez v. Florida Dep't of Business and Professional Regulation, Bd. of Accountancy*, 512 U.S. 136, 146 (1994). There, the *NIFLA* Court determined that the unlicensed notice was targeting a "purely hypothetical" problem that women may enter an unlicensed pregnancy center and not understand that it was staffed by unlicensed medical professionals. *Id.* Additionally, the *NIFLA* Court determined the notice unduly burdened protected speech by requiring the clinics to post the government-drafted script despite what the facility may have provided about its services. *Id.* And, the *NIFLA* Court found that the regulation targeted a "curiously narrow subset of speakers" noting that the regulation targeted clinics providing "pregnancy-related" services, but not other clinics. *Id.* at 2378. The *NIFLA* Court also found that the unlicensed notice was unduly burdensome because it required the government-drafted script be provided on every advertisement, in as many as 13 different languages, and thus would drown out the speaker's own message. *Id.*

In this case, Defendants have proffered various and shifting reasons for the Ordinance. At the time the original Ordinance was adopted, former Commissioner Saltzman explained that the purposes of the Ordinance were two-fold: (1) to "build awareness of seismic risk, about what to do

if you're in an unreinforced masonry building, to duck and cover, not to get out" and (2) to "build market demand for seismic improvements to these buildings." (Hr'g Ex. 19.) Defendants now contend that the tenant notification provision allows prospective tenants, including those who "may reside outside Portland or Oregon and may not be reached through websites, mailings, or meetings" to make "an informed choice regarding their rental unit before they are financially invested in the rental process." (Hr'g Ex. 134 at ¶ 7.) Defendants argue that the tenant notification provision in the Ordinance is not unduly burdensome because the compelled speech is one sentence long, does not compete with Plaintiffs' own message, and thus does not "drown out" Plaintiffs' speech. *NIFLA*, 138 S. Ct. at 2378.

Plaintiffs argue that the justifications offered by Defendants for the Ordinance – such as informing the public about safety in the event of earthquake and creating demand for seismic improvements, are not advanced by the tenant notification provision. Additionally, Plaintiffs contend that the tenant notification provision is unduly burdensome because it does not offer Plaintiffs an opportunity to provide a competing message.

The court concludes that Defendants' primary justification for the tenant notification provision is akin to the purely hypothetical concern addressed in *NIFLA*. While the concern about earthquakes may be real, Defendants offer no support for their justification that URM building owners need to provide the required notice because prospective tenants are unable to access that information via "websites, mailings or meetings." Defendants offer no evidence to support their contention that prospective out-of-state tenants are having difficulty accessing information about URM buildings. *See NIFLA*, 138 S. Ct. at 2377 (finding that the unlicensed disclosure requirement was not justified by evidence); *Am. Beverage*, 916 F.3d at 757 (finding that sugary beverage warning

covering 20 percent of the image was not more effective than a warning covering 10 percent of the image; holding ordinance was unjustified and unduly burdensome under *Zauderer*).

With respect to the other justification – to build market demand for seismic improvements – the court similarly finds that Defendants offer no support for their contention. At the Hearing, Commissioner Saltzman testified that by providing prospective tenants information about URM buildings, prospective tenants could factor that information into their decisions about whether to enter into a lease. (Hr'g Tr. at 228-29.) Commissioner Saltzman also stated that he hoped the Ordinance would put economic pressures on building owners. (*Id.* at 229-30.) Ms. Papaefthimiou testified at the hearing that the City surveyed URM tenants at an open house they sponsored and found that a majority of the tenants who attended did not know it was a URM building at the time they rented. (Hr'g Tr. at 212.) Defendants' theory appears to be that by providing additional information to prospective tenants that buildings are constructed of URM, they may choose not to live there, thereby increasing vacancies in URM buildings, which would in turn put pressure on URM building owners to retrofit or demolish their buildings.

The court finds that the Defendants have failed to proffer any evidence to support the theory that by informing prospective tenants in the lease applications that URM vacancies will increase and cause URM building owners to undertake expensive retrofits or demolition. Aside from purely anecdotal information, Defendants cite no empirical support correlating tenant notifications to increased vacancies. While the court agrees that the City's goal of reducing the inventory of risky buildings is beneficial, as discussed above, the tenant notification provision does not distinguish between completely unreinforced URM buildings and URM buildings that have undertaken some retrofitting already but remain subject to the Ordinance. Nor does the tenant notification provision

apply to other non-URM buildings that are hazardous in major earthquakes. Thus, the tenant notification requirement of the Ordinance provides misinformation and a false sense of security under the guise of building market demand. The court finds that on this record, the tenant notification provision in the Ordinance is not substantially justified.

Additionally, the court finds that the Ordinance is unduly burdensome. In *American Beverage,* the Ninth Circuit enjoined enforcement of the sugary beverage warning because there was no empirical support that the warning's design and content improved understanding of the health harms associated with over-consumption of sugary beverages than other smaller, less intrusive warnings. *Am. Beverage*, 916 F.3d at 757. Thus, the *American Beverage* court determined that as in *NIFLA*, a "government-compelled disclosure that imposes an undue burden fails for that reason alone." *Id.* at 757. Here, the City provides no empirical support for its contention that tenant notifications are necessary because prospective tenants cannot be reached through websites, mailings or meetings. Indeed, the court is not convinced that a public relations campaign informing the public might not reach more Portlanders and prospective tenants outside of Portland about seismic risks. (Hr'g Ex. 13 at 25) (suggesting that the City undertake a comprehensive outreach and awareness campaign about URM buildings). The court concludes the tenant notification provision is not justified and is unduly burdensome when balanced against its likely burden on free speech.

On this record at this preliminary stage, the court concludes that Defendants have not carried their burden of demonstrating that the tenant notification provision is purely factual, noncontroversial, justified and not unduly burdensome. Accordingly, Plaintiffs have demonstrated they are likely to succeed on the merits of their First Amendment claim with respect to the tenant notification provision in the Ordinance.

C. *Placard Provision Does Not Satisfy Strict Scrutiny*

As noted above, the placard provision in the Ordinance is a content based regulation of non-commercial speech, and therefore, is invalid unless Defendants can survive strict scrutiny. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 99 (2011). To demonstrate strict scrutiny, the placard provision must be narrowly drawn to serve a compelling government interest. *Id.*; *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1665-66 (2015). The government must identify an actual problem that is in need of solving, and the compelled speech must be necessary to the solution. *Id.*; *Frudden v. Pilling*, 877 F.3d 821, 828 (9th Cir. 2017) (applying strict scrutiny to requirement that motto be displayed on school uniform).

At the time the original version of the Ordinance was adopted, Commissioner Saltzman identified two interests in support of the placard provision: (1) to "build awareness of seismic risk, about what to do if you're in an unreinforced masonry building, to duck and cover, not to get out," and (2) to "build market demand for seismic improvements to these buildings." (Hr'g Ex. 19.) During the course of this litigation, Defendants have offered additional rationales for the placard that they attempt to fit under the broader goal of "public safety." By the time of briefing for the Hearing, Mr. Kumar proffered that URM buildings are seismically more vulnerable than other buildings, and thus are more dangerous to their occupants and "passers-by" than any other type of construction. (Hr'g Ex. 133 at ¶¶ 9-16.) According to Defendants, because of this unique risk, Defendants have a compelling interest in ensuring that the building occupants and persons nearby are protected from the unique dangers that URM buildings pose. (*Id.*) Thus, Defendants contend that promoting public safety is a core function of the City, and is a compelling government interest. However, at the

Hearing, Defendants were unable to define "passers-by" or explain how a placard posted at the building entrance would accomplish the purpose of protecting them.

The court finds that while promoting public safety is a compelling governmental interest, the City's shifting post-hoc rationalizations do little to advance the City's stated purposes for passing the Ordinance. Even presuming that Defendants' stated interests in "building awareness of seismic risk" and promoting public safety are compelling, they have not demonstrated that the placard provision is narrowly tailored to achieve those interests.[6]

For example, Plaintiffs asked former Commissioner Saltzman during his deposition how the placard provision advances his first stated purpose of building seismic awareness and what to do in the event of an earthquake. (Decl. John DiLorenzo Ex. 1, Dep. Dan Saltzman ("Saltzman Dep.") 36:16-37:19.) In response, Commissioner Saltzman indicated that "given the nature of the unreinforced masonry buildings that the parapets and walls are going to fall off the building," it may be safer for building occupants to stay put, as opposed to running out. (Saltzman Dep. 37:3-11.) Continuing, Commissioner Saltzman stated:

Q.    Let's kind of focus on that point. What is it about the placard that tells a person that, that tells them don't run out, duck and cover? Does the placard say that?

A.    No.

Q.    Then how does the placard further that purpose?

A.    I think the placard instills a daily awareness on residents of buildings or workers of buildings, . . . that's potentially unsafe in an earth quake . . what to do when the event happens.

---

[6] Defendants do not contend and submit no authority to support Commissioner Saltzman's second stated purpose — building market demand for seismic improvements — as a compelling government interest. The court concludes that Defendants have failed to show that building market demand for retrofitting is a compelling interest and declines to address that contention further.

Q.     Okay. So let's assume that because of the placard someone is now aware that they are in a building that could have difficulty in an earthquake. How is it, though, that that awareness educates a person as to now what they should avoid that is instinctual on their part? You said their instinct would be to run out. What is it about the ordinance that helps them avoid furthering their instinct?

A.     Well, as you said, the placard does not do that, but I think there is certainly a lot of public awareness campaigns that the City, Red Cross, others participate in on a regular basis to help people be prepared in an emergency.

Q.     I agree with you.

A.     Which includes a lot of, you know, what to do.

Q.     . . . . I'm at a loss, though, to try to figure out what is it in this ordinance that does that. So I think you'll acknowledge the placards don't tell people to do that?

A.     Right.

(Saltzman Dep. 37:15-38:24.) Commissioner Saltzman agreed that it was "fair to say" that nothing

in the Ordinance furthers the particular purpose to "duck, cover, and not run out." (Saltzman Dep.

39:11-16.) At the hearing, Commissioner Saltzman attempted to clarify that answer by testifying

that the "the ordinance is simply designed to raise awareness of the risk." (Hr'g Tr. at 228.)

Commissioner Saltzman appeared to distance himself from his previously stated purpose that the

Ordinance is designed to inform people about what to do if they are in a URM building – to duck,

cover and not get out.

Moreover, Ms. Papaefthimiou in her deposition testified that the placard itself would not save

any lives, and that she was in favor of mandatory retrofitting:

> [W]e have talked about that a lot internally that in an indirect way placards can save lives if they motivate people to do retrofits or if people pay attention to them and therefore remember to drop, cover and hold on; then that could save lives. But the placard itself doesn't save any lives and I mean, I guess I would add that's been a frustration of us working on the project is that placards were a compromise. We really wanted people to retrofit their buildings and save lives.

(Papaefthimiou Dep. 82:2-9, ECF No. 26-4.) In a tacit acknowledgment that the placards do not further the City's purpose about what to in the event of an earthquake, Ms. Papaefthimiou discussed that the City is developing an informational poster that explains what to do if an earthquake occurs with graphics, which Ms. Papaefthimiou noted "will be more effective than the placard." (Papaethimiou Dep. at 52:16-53:7, 53:10-11.) Thus, the placard requirement in the Ordinance simply is not narrowly tailored to achieving Defendants' stated purpose of informing the public to duck, cover and not get out.

Defendants argue that placarding is "[t]he *only* practical way to inform most people who live in, work in, or enter URM buildings of the risks posed by such building is by placards affixed to those buildings." (Hr'g Ex. 134 at ¶ 6.) Defendants contend that:

> [i]nformation on the City website fails to reach many URM building users or potential owners because they may not know to look for the website; underserved communities in particular may also not have easy access to the internet, or may not be fluent in English. Mailings also do not reach many URM building users or potential owners; . . . In addition, many people who receive mailings may not read them. Many people do not choose to attend a public meeting; they may not learn of them if they do not read their mail. Other media campaigns fail to reach many individuals, including some of the most vulnerable populations because they may not regularly read local media.

(*Id.*) In short, Defendants argue – without evidence – that a public relations campaign will not work because URM building users are not fluent in English, are not likely to read a mailing, or do not regularly read local media. Yet, Defendants offer no justification for their contention that these same URM building users and occupants actually will read a placard, and will read one that is posted only in English. This glaring contradiction demonstrates that simply posting a placard is not narrowly tailored to informing URM building users and occupants to its purported compelling interest of

increasing awareness of seismic risk. *See Frudden*, 877 F.3d at 829 (holding school failed to demonstrate how logo on school uniform was connected to improving student achievement).

And, Defendants have made no attempt to explain how other plausible, less restrictive means of raising awareness about the seismic risks posed by URM buildings are ineffective. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 826 (2000) (providing that government failed to show that regulation was the least restrictive means for addressing problem of signal bleed). Defendants have not shown that a public relations campaign would be ineffective in raising awareness or ineffective in providing appropriate instruction about what to do in the event of earthquake. At the Hearing, Commissioner Saltzman acknowledged that if the City was interested in only building awareness, it could maintain a public awareness campaign on its own. (Hr'g Tr. 228.) *See also NIFLA*, 138 S. Ct. at 2376 (finding that California had not shown public relations was ineffective in reaching individuals simply because it received a tepid response to its advertising campaign).

Defendants contend that the Ordinance is modeled after a similar law in California, and suggest that the "California law has proved successful in warning visitors and tenants of the risks of URM buildings an providing an incentive to retrofit." (Defs.' Resp. Am. Mot. Prelim. Injunction at 6, citing Vannier Decl. Ex. 3.) Defendants rely on information from the City of Berkeley indicating that since 1991, it has reduced its inventory of URM buildings from 587 to six. (Vannier Decl. Ex. 3 at 1.) However, that information provides no support for Defendants' proposition that the placards and tenant notifications are responsible for the reduction of the URM building inventory. To the contrary, Ms. Papaefthimiou testified at the hearing that Berkeley adopted mandatory retrofitting standards and a suite of options to assist with financing retrofits. (Hr'g Tr.

at 216.) And, the City of Berkeley's information provides at least two hyperlinks to financial assistance available to owners of URM buildings for retrofitting, suggesting on this record that the mandatory retrofitting requirement and the financial assistance are the more credible reasons for the reduction in URM building inventory. (Hr'g Ex. 114.) Thus, Defendants information provides no causal effect, or even a correlation between posting placards and reducing the City's URM building inventory.

Furthermore, the placarding requirement targets a "curiously narrow subset of speakers." *NIFLA*, 138 S. Ct. at 2377. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. Here, the Ordinance has singled out URM building owners for treatment without adequate explanation. As the Policy Committee pointed out, soft-story construction, non-ductile concrete construction, and construction in liquefaction zones pose risks similar to URM buildings in major earthquakes. (Hr'g Ex. 10 at 32.) The Standards Committee identified non-ductile concrete and URMS as "the most dangerous building types" and recommended that they not be allowed to remain in service indefinitely unless they are fully upgraded. (Hr'g Ex. 6 at 6.) Thus, if Defendants' justification for the placard requirement is to build awareness of seismic risk, clearly that risk extends to soft-story construction, non-ductile concrete construction, and construction in liquefaction zones. But these building types were removed from the Policy Committee's Final Report, undermining Defendant's proffered purpose. (Hr'g Exs. 10, 11.)

Further undermining Defendants' rationale that the placarding provision is narrowly tailored, it exempts thousands of single- and dual-family residential URM buildings from the Ordinance. Additionally, Commissioner Saltzman delayed enforcement of the placarding provision for all

Portland Public Schools, which the Policy Committee identified as high-occupancy structures posing "substantial life-safety risk." (Hr'g Ex. 13 at 18; Tr. 227-28; Saltzman Dep. 60:9-61:8.) Thus, the Ordinance is "wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it." *Brown*, 564 U.S. at 802; *NIFLA*, 138 S. Ct. at 2376 (noting that underinclusiveness calls into question the government's true purpose).

Finally, the Ordinance is also demonstrably overinclusive because it mandates that all targeted building owners declare that their buildings are constructed of unreinforced masonry and may be unsafe in the event of an earthquake, despite that those compelled statements may be false in some instances. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (discussing that ordinance was overinclusive because it restricted significantly more speech than is necessary to achieve its goals). As discussed above, Trinity Place Apartments have been retrofitted to withstand a major earthquake, but are covered by the Ordinance. (Hr'g Ex. 71 at ¶¶ 6-8.) Likewise, Fountain Village has undertaken some retrofitting, yet remains covered by the Ordinance. (Hr'g Ex. 72 ¶¶ 1-5.) And, as noted previously, the Ordinance relies on a URM database that the City itself disclaims is wholly accurate: "The City of Portland makes no representations, express or implied as to the accuracy of this database. There are no assurances as to whether the information presented is correct or comprehensive." (Hr'g Ex. 39.) Therefore, Defendants have not demonstrated that the placard provision does not restrict more speech than necessary to achieve their stated goals.

After reviewing the extensive record and listening to two full days of testimony in this action, at bottom it appears to this court that Defendants lacked the political will or public support to achieve its desired goal: mandatory retrofits for URM buildings. The Policy Committee, the

Standards Committee, and the City's structural engineers Mr. Kumar and Mr. Hagerty recommended mandatory retrofits. Several California jurisdictions had success in reducing their URM inventories because they enacted mandatory retrofitting. As Commissioner Saltzman acknowledged, he did not have enough support on the Portland City Council to require mandatory retrofits. (Hr'g Exs. 21, 29.) And Ms. Papaefthimiou agreed that the placards were a compromise.

However, Defendants may not burden speech to accomplish indirectly what the City Council lacked the political will or public support to accomplish directly. *NIFLA*, 138 S. Ct. at 2376 ("California cannot co-opt the licensed facilities to deliver its message for it."); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578-79 (2011) ("[A] State's failure to persuade does not allow it to hamstring the opposition. The State may not burden the speech of others in order to tilt public debate in a preferred direction."). The City's failure to garner support for mandatory retrofitting does not give it permission to burden URM building owners with its message in a manner contrary to the First Amendment.

On this record at this preliminary stage, the court concludes that Defendants have not carried their burden of demonstrating that the Ordinance furthers a compelling governmental interest and is narrowly tailored to further that interest. Accordingly, Plaintiffs have demonstrated they are likely to succeed on the merits of their First Amendment claim with respect to the placard provision in the Ordinance.

IV.    Irreparable Injury, Equities, Public Interest

Because Plaintiff s have demonstrated that they are likely to succeed on the merits of their First Amendment claim as to the placard and tenant notification provisions, the court addresses the remaining preliminary injunction factors. *Am. Beverage*, 916 F.3d at 755 (listing elements of

preliminary injunction as (1) likely to succeed on the merits, (2) likely to suffer irreparable harm, (3) balance of equities tips in his favor, and (4) an injunction is in the public interest).

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). The court's analysis focuses on irreparability, "'irrespective of the magnitude of the injury.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)). "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Winter*, 555 U.S. at 22).

The Ninth Circuit has recognized that a loss of First Amendment freedoms, for even minimal amounts of time, constitutes an irreparable injury. *Harris*, 772 F.3d at 583 (quoting *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012)); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Additionally, "'[t]he fact that [Plaintiffs] have raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [Plaintiffs'] favor.'" *Am. Beverage*, 916 F.3d at 758 (quoting *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (internal quotation marks omitted) (alterations in *American Beverage*). Where the government is a party, the balance of equities merges with the public interest factor. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Defendants argue that Plaintiffs cannot demonstrate irreparable injury because the potential imposition of fines is not imminent: the placarding and acknowledgment provisions do not take

effect until November 1, 2020. Additionally, Defendants argue that fines are economic damages that can be remedied by an award of damages after resolution on the merits. Defendants maintain that a preliminary injunction is not warranted because Plaintiffs have not shown that they will suffer immediate or imminent harm.

In this case, Plaintiffs readily satisfy the elements for a preliminary injunction. Plaintiffs have demonstrated a likelihood of success on the merits of their First Amendment claim on the placard and tenant notification provisions of the Ordinance. The court finds that Plaintiffs have demonstrated they likely will suffer irreparable harm if the Ordinance takes effect. Plaintiffs have demonstrated they will be injured beginning June 1, 2019, when they are required to provide a potentially factually inaccurate and misleading statement to prospective tenants in their lease applications. *Harris*, 772 F.3d at 583 ("[A] colorable First Amendment claim is irreparable injury sufficient to merit the grant of [preliminary injunctive] relief.") Mr. McMonies and Mr. Beardsley testified that if the Ordinance goes into effect, they will be forced to provide false, or at least inaccurate and misleading, information to prospective tenants that their buildings are unreinforced when their buildings have undertaken seismic upgrades. *See Oregon v. Azar*, Case No. 6:19-cv-00317-MC, 2019 WL 1897475, at 15-16 (D. Or. Apr. 29, 2019) (discussing that plaintiffs demonstrated irreparable injury because of massive cuts to Title X funding if the final rule went into effect). Defendants' contention that the effort for Plaintiffs to provide the URM disclosure in the lease applications is relatively modest in light of other disclosures already required by law, misses the point. The question for the court is not the severity of the harm, but whether the harm is irreparable. Here, Plaintiffs will be required to speak a government-drafted message that is misleading at best. *Washington Post v. McManus*, 355 F. Supp. 3d 272, 305-06 (D. Md. Jan. 13,

2019) (granting preliminary injunction on First Amendment grounds). Clearly, this factor weighs in Plaintiffs' favor.

Furthermore, the Ordinance carries the risk of substantial fines for failing to comply, raising the risk for extraordinary harm. *See Harris*, 772 F.3d at 583 (finding the risk of criminal penalties for failing to comply with reporting requirement weighed in favor of granting preliminary injunction). Thus, the court finds that Plaintiffs are likely to suffer irreparable harm without injunctive relief because if the Ordinance is permitted to take effect, it will violate Plaintiffs' First Amendment rights.

The balance of equities and the public interest also weigh in favor of granting the injunction. Insisting that URM building owners post a placard and inform tenants has not been shown to demonstrably increase awareness of seismic risk or inform the public about how to "drop, cover, and hold on." Requiring URM building owners to display and distribute a factually inaccurate message would permit Defendants to infringe on the speech rights of a handful of Portlanders while failing to take steps to actually increase seismic awareness for all Portlanders. Thus, the significant public interest in upholding First Amendment principles is acutely on display in this case, and weighs in favor of an injunction. The Ninth Circuit "consistently recognize[s] the significant public interest in upholding free speech principles." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (finding "balance of equities and the public interest thus tip sharply in favor of enjoining" where plaintiff likely to succeed on merits of First Amendment claim); *Innovation Law Lab v. Nielson*, 342 F. Supp. 3d 1067, 1082 (D. Or. 2018) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") In summary, Plaintiffs have satisfied each of the requirements for a preliminary injunction.

Because the court concludes that Plaintiffs have demonstrated colorable First Amendment violations pertaining to the placarding and tenant notification provisions and that a preliminary injunction should issue on that basis, the court consequently enjoins enforcement of the acknowledgment provision of the Ordinance. The acknowledgment provision requires URM building owners to document their compliance with the placarding and tenant notification provisions on a BDS form. P.C.C. 24.85.65(E). The court is enjoining enforcement of the placard and tenant notification provisions, therefore practically speaking, there is no compliance to acknowledge. Similarly, because Plaintiffs have demonstrated colorable First Amendment violations, the court declines to address Plaintiffs' argument that the Ordinance also violates the Due Process Clause under the Fourteenth Amendment.

V.    Bond

Rule 65 of the Federal Rules of Civil Procedure instructs that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). However, federal courts have discretion to determine the amount of security, or forego the security requirement altogether. *Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *Innovation Law Lab*, 342 F. Supp. 3d at 1082; *see also Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (" Rule 65(c) invests the district court with discretion as to the amount of security required, if any.") (internal quotation omitted). The court has considered the relative hardships and the likelihood of success on the merits and concludes that requiring security is unwarranted. If Plaintiffs do not prevail, Defendants, and each of them, will suffer no damages.

*Preliminary Injunction*

Having considered the record, the parties respective arguments and positions, and the relevant equities, the court HEREBY ORDERS:

1. Pursuant to Federal Rule of Civil Procedure 65, the court imposes a preliminary injunction to prohibit enforcement of the City of Portland Ordinance No. 189399, as amended by Ordinance No. 189479, until this court or another court of competent jurisdiction orders otherwise.

2. All public and private persons, businesses, entities, and organizations who or which are subject to the Ordinance are not required to comply with any provision of the Ordinance, including but not limited to provisions requiring the posting of placards, the disclosures of information to prospective tenants, and the requirement that an acknowledgment of compliance be filed with the Bureau of Development Services.

3. During the pendency of this injunction, the City may not take action in reliance on the Ordinance, including but not limited to informing owners of URM buildings that they must comply with the Ordinance, that they are not in compliance with the Ordinance, or that they shall or may be fined for noncompliance with the Ordinance.

4. A preliminary injunction is necessary because Plaintiffs have demonstrated a substantial likelihood of success on their First Amendment Claim and enjoining enforcement of the Ordinance is necessary to prevent violations of Plaintiffs' constitutional rights. Plaintiffs have demonstrated that they will suffer imminent irreparable harm if they are required to comply with the Ordinance, and that the balance of equities tips favors Plaintiffs and it is in the public interest to prevent the violation of Plaintiff's constitutional rights.

////

*Conclusion*

Based on the foregoing, Plaintiffs' Amended Motion for Preliminary Injunction (ECF No.

44) is GRANTED.

IT IS SO ORDERED.

DATED this 30th day of May, 2019.

JOHN V. ACOSTA
United States Magistrate Judge

# This is an Unreinforced Masonry Building.

# Unreinforced Masonry Buildings may be unsafe in the event of a major earthquake.

# P.C.C.24.85.065

Appendix A

Exhibit 110
Page 1 of 1